IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> vs.<br><br>TALIS DALE,<br><br>     Defendant. | 8:21CR225<br><br>FINDINGS AND RECOMMENDATION |

   This matter is before the Court on the Motion to Suppress Statement (Filing No. 25) filed by Defendant, Talis A. Dale. Defendant seeks to suppress statements he made during a May 4, 2021, custodial interview. Defendant further seeks suppression of any DNA evidence obtained from two buccal swabs during the same custodial interview. (Filing No. 27). Defendant filed a brief (Filing No. 27) in support of his motion and the government filed a brief (Filing No. 34) in opposition. The undersigned magistrate judge held status conferences with counsel on October 18 and December 1, 2021, regarding pre-evidentiary hearing matters.

   The Court held an evidentiary hearing on the motion on January 20, 2022. Defendant was present with his attorney, Richard H. McWilliams. The government was represented by Assistant United States Attorney, Lecia E. Wright. Testifying on behalf of the government were: Special Agent Samuel Roberts ("SA Roberts") of the Federal Bureau of Investigation; Morgana Dale, Defendant's mother; and Lisa Stabler, Defendant's grandmother. The Court received into evidence, without objection, the government's Exhibit 1 (signed FD-395 Advice of Rights form); Exhibit 2 (signed FD-26 Consent to Search form); and Exhibit 3 (audio recording of the interview). The Court also received into evidence, without objection, Defendant's Exhibit 101 (selection of Defendant's psychiatric records); Exhibit 102 (an Omaha Nation Police Report dated April 12, 2021); and Exhibit 103 (Defendant's handwritten statement made on May 4, 2021). (TR. 81-82). The Court also took judicial notice of the Pretrial Services Report at Filing No. 6 in this case. A transcript (TR.) of the evidentiary hearing was prepared and filed on February 10, 2022. (Filing No. 44). The government also filed a transcript of the interview between Defendant and SA Roberts (IT.) as an aid to the Court on February 17, 2022. (Filing No. 46).[1] The matter is now

---

[1] Counsel for Defendant does not object to the use of this transcript solely as an aid to the Court, but does object to its accuracy and use for any other purpose.

fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be denied.

## BACKGROUND

At approximately 9:00 a.m. on May 3, 2021, Defendant was arrested after a minor relative, D.C., reported Defendant had sexually assaulted her in her home the previous night. SA Roberts[2] became involved in the investigation after Defendant's arrest. SA Roberts first went to the reported crime scene and spoke to other law enforcement agents about what happened. (TR. 17-18). SA Roberts also attended the Child Advocacy Center ("CAC") interview of D.C. on May 3, 2021. SA Roberts spoke to booking officers at the Omaha Nation Law Enforcement Center about Defendant's level of intoxication and medication when he was first taken into custody. Defendant had informed booking officers he was diagnosed with paranoid schizophrenia and had not taken his medication that day, after which it was administered to him. (TR. 7-9, 14, 19, 22).

In the morning on the following day, May 4, 2021, SA Roberts and Omaha Nation Law Enforcement Services Officer Roberto Gorrin ("Officer Gorrin") interviewed Defendant at the correctional facility regarding D.C.'s allegations. SA Roberts was wearing plain street clothes and spoke to Defendant across a table in a small cafeteria room at the correctional facility. Defendant had been in custody for 24 hours without access to alcohol and had been administered his medication the morning of the interview. (TR. 8-9, 22). SA Roberts introduced himself, told Defendant he was recording the conversation, and read Defendant a *Miranda* rights advisement using a FD-395 Advice of Rights form. (TR. 9-10; IT. 2-3). SA Roberts asked Defendant to read the last sentence of the rights advisory form out loud if he understood his rights. Defendant recited, "I have read the statement of my rights, and I understand what my rights are. At this time I am willing to answer the questions without a lawyer present." SA Roberts asked Defendant, "Do you mind signing for me?" and Defendant signed the form. (TR. 10; Ex. 1; Ex. 3 at 0:35-50).

After Defendant signed the right advisory form, SA Roberts asked Defendant, "Would you be opposed to me swabbing the inside of your mouth with a Q-Tip[?]" Defendant replied, "Yes." SA Roberts clarified, "Yes, you do want that, or no?" and Defendant replied, "No, you can, you can [inaudible] . . . " SA Roberts clarified again, "I can do it?" and Defendant replied, "Yeah" and

---

[2] SA Roberts is a SA in the FBI and primarily investigates major crimes and violent crimes on the Omaha, Santee, and Winnebago Native American reservations. (TR. 6-7).

signed an FD-26 Consent to Search form at SA Roberts' request. (Ex. 3 at 1:00-45; Ex. 2; TR. 11-13). Although the Consent to Search form states, "I have been advised of my right to refuse consent," SA Roberts did not have Defendant read each line of the Consent to Search form and SA Roberts did not verbally advise Defendant of his right to refuse consent. (TR. 12). One of the officers asked Defendant how he was doing, and he replied, "Cold." (Ex. 3 at 1:45-55). The officers then collected two buccal swabs from Defendant. (*Id.* at 1:57-3:15).

SA Roberts began the interview by telling Defendant he was just trying to "figure out what happened," asking Defendant to "talk me through your whole day" until "the cops showed up." (IT. 4-5). Defendant stated he did not remember anything after he got home because he was drunk. SA Roberts continued to probe Defendant's memory for a few minutes before stating, "So, obviously, you know why you were arrested, right? . . . Do you want to talk about that? That's what I'm here to talk about" and Defendant replied, "Yeah." (Ex. 3 at 6:32-41; TR. 14). Defendant again stated he didn't "remember it happening." SA Roberts responded by telling Defendant that D.C. had undergone a sexual assault nurse examination ("SANE") kit, which would "pull back" DNA from her body and let officers know the "people she interacted with." SA Roberts also told Defendant the CAC spoke with D.C. about what happened. SA Roberts told Defendant he should give his story because saying he "didn't know" was "not helping [Defendant] at all."

Defendant continued to insist he could not remember what happened and SA Roberts continued to question Defendant about his memory, asking why D.C. "would . . . be saying these things?" At that point, Defendant suggested, "Maybe my voice took over?" SA Roberts asked, "What's your voice?" and Defendant replied, "Schizophrenic." (Ex. 3 at 16:24-40). Defendant said his voice is "hard to control" when he is drunk. SA Roberts then incorporated Defendant's "voice" into his interrogation:

> What I need to understand is who was in that room that night. Was it Talis, or was it the voices? Because if it's the voices, that's something different, and that needs to be addressed, and we need to do it now because if we can't handle this now – We're not going to be able to tell this story later. This is -- This is our only time to get the truth out because after this, when that [SANE] kit comes back, they're not going to know the difference between Talis and the voices. It's just gonna be Talis. . . . And then when [D.C.'s] statement comes out, it's not gonna be the voices or Talis; it's just going to be Talis, and then now you have no, no chance to defend yourself. So that's why I'm here. And I want you to explain it to me. Because I, I understood. I knew you didn't take your medication when I came in here. I knew

3

> you had a condition before I even came in here. You told me that, and that's why I'm in here talking to you. But I need to understand what happened. I need to understand the truth, and if it's the voices that did it, you need to explain to me that.

(*Id.* at 17:30-18:34). After Defendant again replied, "I don't remember," SA Roberts stated that answer was helping "them," i.e., the voices, not Talis. (*Id.* at 18:34-41).

SA Roberts asked Defendant about D.C. and the layout of the house for a few minutes, then returned to the topic of Defendant's voices. (*Id.* at 22:45). Defendant stated he "can't control it when I'm drunk. But when I'm sober, like now, I control it." SA Roberts suggested Defendant is "clearly two different people" and by stating Defendant doesn't remember anything, he is "protecting this other thing, which is not serving you at all." SA Roberts then stated, "I don't think Talis was making any decisions that night. I think you came home and, and Talis was out. And the voices were running the show . . . What did they do?" (*Id.* at 22:45-25:35). Defendant eventually responded, "I think I just touched her." SA Roberts suggests, "Talis didn't touch her, the voices did; right?" and asked Defendant where "they" touched her. (*Id.* at 27:34-45). SA Roberts stated "Talis" would never hurt D.C. and that they were both "on this team figuring out what happened" to protect D.C., and they were both going to "get after the voices." (*Id.* at 32:10-33:30). SA Roberts continued to state Talis and SA Roberts were on the same team working to protect D.C.

SA Roberts asked Defendant if there was "anything else you can think of that we should know . . . to help fix the voices?" Defendant replied, "Can you tell her I'm sorry?" and also "tell my family I'm sorry" and begins crying. (*Id.* at 38:35-39:04). SA Roberts then offered to let Defendant write an apology letter, which "would help Talis." Some paper shuffling can be heard on the audio before SA Roberts says, "Now, that's not gonna count. I need you to write down there what you're sorry for. Tell them what happened." (*Id.* at 39:05-39:33). Defendant then wrote, signed, and dated the letter, saying he is sorry and wants everyone to understand "it's just the voices." (Ex. 103).

At the conclusion of the interview, SA Roberts asked Defendant whether he was taking his medication in the correctional facility and whether he had taken it that day; Defendant replied "Yeah" to both questions. The entire encounter lasted approximately 45 minutes. (Ex. 3). At no point during the interview did Defendant ask for SA Roberts to stop questioning, refuse to answer a question, ask for an attorney, or seem confused about the purpose and nature of the interview.

(TR. 13-14). SA Roberts testified his tone in the interview with Defendant was "Conversational at times" with "inject[ed] emotions" reflecting the subject and "Maybe mild confrontational." SA Roberts also did not threaten Defendant or make any promises of leniency prior to Defendant signing his waiver of *Miranda*. (TR. 11).

Defendant presented evidence of his recent psychiatric history. A few weeks before the incident giving rise to the current charges, April 12, 2021, Defendant was arrested after allegedly trying to touch his minor sister. That incident report notes Defendant stated he had been sexually assaulted when he was younger. (Ex. 102). Defendant underwent a psychiatry evaluation at the Carl T. Curtis Health Education Center on April 29, 2021. (Ex. 101 at p. 4). During his evaluation, Defendant stated he struggled with reading and English because of the "distracting voices that he hears." Defendant was diagnosed with generalized social anxiety disorder, dysthymia, a psychotic disorder not otherwise specified, chronic posttraumatic stress disorder, and marijuana use disorder, and was prescribed Lexapro and Geodon. (Ex. 101 at p. 7).

Defendant's mother, Morgana Dale, testified that Defendant understand English and was able to understand what was going on in their home, although he struggled with reading in school. When asked if Defendant was generally able to hold a conversation, Morgana replied, "It's always really quick answers and -- yeah. Not really." (TR. 34). Morgana noticed a difference in Defendant after he began taking his medication and Defendant told Morgana he felt better on it. (TR. 35-36). Morgana testified that it took about two weeks for the medicine to make a difference for Defendant based on what her own counselor told her about her own medication and her own observations of Defendant. (TR. 50-51, 54). Morgana testified that when Defendant is sober, even prior to taking his medication, there were no occasions where Defendant did not understand who she was or where he was. (TR. 52-53).

Defendant's grandmother, Lisa Stabler, testified that she lived in the same home as Defendant, off and on, until he was about 16 or 17 years old. Defendant was sent to boarding school at some point during his childhood. Lisa testified Defendant was "spoiled" as a child and replied he was, "just like another kid" when asked whether he understood and comprehended "what was going on around him." When asked whether anything stuck out in her mind that was different about Defendant as a child, she replied "No." (TR. 58). Lisa testified that Defendant seemed to be able to understand her whenever they interacted in the two months preceding his arrest. (TR. 63).

5

Defendant has filed the instant motion to suppress all statements and any DNA evidence obtained from the buccal swabs during his May 4, 2021, interview. (Filing No. 25). Defendant argues his statements were involuntary because of SA Roberts' "overreaching police conduct" coupled with Defendant's mental condition, and must therefore be suppressed as violative of the Fifth Amendment. Defendant also argues that the buccal swabs were obtained without warrant or Defendant's valid consent, in violation of the Fourth Amendment. Defendant asserts his consent was invalid because SA Roberts did not read the consent form to Defendant, did not state the swabs were to obtain Defendant's DNA, and did not advise Defendant he had the right to refuse consent. (Filing No. 25).

In response, the government argues Defendant voluntarily made statements after he had been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the actions of law enforcement in questioning Defendant did not overbear his will. (Filing No. 34). The government further asserts Defendant's consent to the buccal swab was valid and voluntary, regardless of SA Roberts' failure to verbally advise Defendant he had the right to refuse consent. Alternatively, the Government argues that even if the consent given by Defendant is not voluntary, the buccal swab would inevitably have been obtained pursuant to a warrant. (Filing No. 34).

## ANALYSIS

### I.   Statements to Law Enforcement

Defendant contends his verbal and written statements to SA Roberts were involuntary, despite being provided with a *Miranda* warning. Defendant argues his statements were involuntary because SA Roberts knew of Defendant's mental illness and exploited it, used leading questions, and directly or implicitly promised to help Defendant.

"Although the requirement that a *Miranda* warning be given does not dispense with the voluntariness inquiry, "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001) (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting United States v. LeBrun, 363

F.3d 715, 724 (8th Cir. 2004)). When determining whether a defendant's will has been overborne, a court examines the totality of the circumstances, "including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *Id.* (quoting United States v. Brave Heart, 397 F.3d 1035, 1040 (8th Cir. 2005)). Factors a court should consider include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (quoting United States v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011)). "[T]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices," do not "render a confession involuntary . . . unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" *Id.* (quoting *Brave Heart*, 397 F.3d at 1041). A defendant's mental condition, including intellectual ability, is a "significant factor" in evaluating the voluntariness of a defendant's statements. *Colorado v. Connelly*, 479 U.S. 157, 165 (1986); see also *United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995) (rejecting defendant's assertion that "his waiver [of *Miranda*] and confession were involuntary because he [was] of average or lower than average intelligence"). But, Defendant's diagnosed mental illnesses does not *per se* render his statements involuntary unless there is evidence of government coercion. *Connelly*, 479 U.S. at 164; see also *LaRette v. Delo*, 44 F.3d 681, 688-89 (8th Cir. 1995) ("A defendant's mental condition alone is not enough to render a confession constitutionally involuntary; there must be coercive police activity[.]").

Defendant argues his statements were involuntary because SA Roberts knew of Defendant's mental illness and exploited it by asking for Defendant's "help" to defeat the voices and by making comments such as, "Talis didn't touch her. The voices did, right?" Defendant further contends SA Roberts implicitly promised to help Defendant if Defendant would describe what "the voices" did. Defendant likens his circumstances and the leading questions employed by SA Roberts to *Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001), wherein the Eighth Circuit concluded a mentally handicapped defendant's confession was involuntary. In that case, the defendant had spent his entire schooling in special education classes, was unable to distinguish fantasy from reality, and was isolated and interrogated for over four hours; the interrogating officers also lied, offered to help the defendant if he confessed, used threatening tones and language, restricted the defendant's movement, used leading questions, and told the defendant that

7

his proclamation of innocence would make his penalties even more harsh for "lying" to the police. *Id.* at 952-53.

Here, SA Roberts did incorporate Defendant's statement that he hears "voices" into the interrogation, suggesting Defendant is different from his "voices," and utilized a sort of us vs. them (the voices) interrogation tactic. However, after review, the undersigned magistrate judge finds that overall, SA Roberts' tactics did not overbear Defendant's will. Although SA Roberts knew of Defendant's mental condition prior to the interview, Defendant was the first one to raise the idea that "maybe my voice took over" approximately 16 minutes into the interview. Defendant indicated he is in control of "the voice" when he is sober, and he was sober during the interview. Additionally, while he was in custody, and prior to the interview, Defendant was administered his prescription medication for his mental conditions.[3] Unlike the defendant in *Wilson*, the record reflects Defendant understood why he was arrested and why he was being questioned. Throughout the interview, Defendant did not have trouble understanding what SA Roberts was asking and responded appropriately. Defendant appeared lucid and was not disoriented or confused. Defendant's close relatives testified that Defendant understood and comprehended his surroundings, although he may be distracted easily. While there was evidence Defendant may have had some trouble reading as a child, at the outset of the interview Defendant read out loud, without difficulty, the sentence on the Rights Advisory Form before signing it. Defendant was 21 years old at the time of the interview. He appears to be of average intelligence, and had been arrested at least twice before, so he was not a complete novice in the criminal justice system. (Filing No. 6). Additionally, the circumstances surrounding the interview were not coercive. The interview was conducted in a cafeteria; SA Roberts was dressed in plain clothes and only one other officer was present; and SA Roberts did not threaten or make explicit promises to Defendant. In questioning Defendant, SA Roberts did not raise his voice or intimidate Defendant. The entire encounter lasted 45 minutes. There is no evidence of any threat of coercion, hours-long isolation, restrictions on movement, or the kind of mental handicap as described in *Wilson*. Even if SA

---

[3] The psychiatric records before the Court do not clearly establish that Defendant had received a formal diagnosis of paranoid schizophrenia. During Defendant's April 29, 2021, psychiatry evaluation, Defendant's history notes that when Defendant was in boarding school as a child, he saw a therapist for about three weeks "who felt he may be showing signs of borderline schizophrenia." The records from this date diagnosed Defendant with generalized social anxiety disorder, dysthymia, a psychotic disorder not otherwise specified, chronic posttraumatic stress disorder, and marijuana use disorder, and he was prescribed Lexapro and Geodon. (Ex. 101 at p. 7). On May 27, 2021, the diagnostic impression included, "Mood disorder NOS" and "Psychotic disorder NOS." (Ex. 101 at p. 2).

Roberts did suggest he could help Defendant, or that telling the truth would be better for Defendant, or play to Defendant's emotions, the totality of the circumstances does not establish Defendant's will was overborne by such tactics.  See, e.g., *United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (noting that neither a promise of leniency, an expressed disbelief in the defendant's statements, nor lies to the defendant about evidence against him necessarily render a confession involuntary); *Simmons*, 235 F.3d at 1133 (quoting *Bolder v. Armontrout*, 921 F.2d 1359, 1366 (8th Cir. 1990)) ("The statement to an accused that telling the truth 'would be better for him' does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary.").

Considering the totality of the circumstances, the undersigned magistrate judge finds Defendant's will was not overborne by the questioning techniques that were employed by SA Roberts.  Therefore, the undersigned magistrate judge finds Defendants' statements were and voluntary and should not be suppressed.

## II.   Consent to Buccal Swabs

Defendant next asserts his consent to the buccal swabs was invalid.  "Free and voluntary consent renders a search reasonable under the Fourth Amendment." *United States v. Welch*, 951 F.3d 901, 906 (8th Cir. 2020) (citing *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005)). "If the government shows that [a defendant] knowingly and voluntarily consented to the cheek swab, then the DNA evidence is admissible." *Id.*  "The government's burden cannot be discharged by showing mere acquiescence to a claim of lawful authority. . . . Rather, the government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice that he or she was making." *Id.* (quoting *Sanders*, 424 F.3d at 773 (8th Cir. 2005) (internal quotation marks omitted).  "Whether or not the consent was voluntary must be established by examining the totality of the circumstances, including 'both the characteristics of the accused and the details of the interrogation.'" *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000) (quoting *United States v. Chaidez*, 906 F.2d 377, 380-81 (8th Cir. 1990)).  Characteristics of the individual include "age, intelligence, intoxication, advice of *Miranda* rights, and previous arrests," and characteristics of the environment include "length of detention, threats and misrepresentations by police, whether the individual is in custody or under arrest, whether it is a public or private place, and the suspect's

9

contemporaneous objections and representation[.]" *United States v. Reinholz*, 245 F.3d 765, 780 (8th Cir. 2001).

Many of same factors guiding the court's voluntary analysis discussed above are also salient here. At the time Defendant provided consent to the swabs, he was 21 years old, was sober, and had been administered his prescription medication to manage his mental conditions. SA Roberts was wearing plain clothes and introduced himself as an FBI special agent. SA Roberts and one other law enforcement officer spoke to Defendant in a cafeteria across from a table. Defendant understood where he was and why he was there. Defendant's consent to the swabs was given very early in the interview—within minutes after SA Roberts first began speaking to him and shortly after SA Roberts provided Defendant with a *Miranda* rights advisement. Prior to giving his consent to the buccal swabs, Defendant had read out loud the last line of the *Miranda* Rights Advisory Form and signed a waiver. Immediately after signing the rights advisory form, SA Roberts asked Defendant, "Would you be opposed to me swabbing the inside of your mouth with a Q-Tip[?]" Defendant replied, "Yes." SA Roberts clarified, "Yes, you do want that, or no?" and Defendant replied, "No, you can, you can . . . " SA Roberts clarified again, "I can do it?" and Defendant replied, "Yeah." SA Roberts's tone was conversational, and he did not coerce, threaten, intimidate, or otherwise induce Defendant's consent, and asked questions to confirm that Defendant indeed was giving consent.

While SA Roberts may not have verbalized Defendant's right to refuse consent, "[t]he [Supreme] Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." *United States v. Drayton*, 536 U.S. 194, 206 (2002); ); see also *United States v. Esquivias*, 416 F.3d 696, 701 (8th Cir. 2005) ("While the officers did not inform [the defendant] of his right to refuse consent, a defendant need not be aware, nor must an officer inform him, of his right to refuse consent for his consent to be voluntary."). And after verbally consenting, Defendant signed the Consent to Search form, which provides "I have been advised of my right to refuse consent." (Ex. 2). Defendant had just demonstrated he could read English by reading the last line of the *Miranda* rights advisory form, and there was no indication SA Roberts prevented Defendant from reading the Consent to Search form prior to signing it. Under the totality of the circumstances, the undersigned magistrate judge finds that Defendant's consent to the buccal swabs was given voluntarily. Upon consideration,

**IT IS HEREBY RECOMMENDED** to United States District Court Chief Judge Robert F. Rossiter, Jr. that Defendant's Motion to Suppress Statement (Filing No. 25) be denied.

Dated this 14th day of March, 2022.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.